IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

TINA GRYGLEWSKI            )
                           )
v.                         )        No. 3:05-0366
                           )        Judge Wiseman/Bryant
MICHAEL J. ASTRUE, Commissioner of )
Social Security[1]          )

To:  The Honorable Thomas A. Wiseman, Jr., Senior Judge

## REPORT AND RECOMMENDATION

        This is a civil action filed pursuant to 42 U.S.C.
§ 405(g), to obtain judicial review of the final decision of the
Commissioner of Social Security denying plaintiff disability
insurance benefits (DIB), as provided under Title II of the
Social Security Act ("the Act"), as amended.  This case was
transferred to the docket of the undersigned by order entered
August 10, 2006 (Docket Entry No. 33).  The case is currently
pending on plaintiff's motion for judgment on the administrative
record (Docket Entry No. 18), to which defendant has responded
(Docket Entry No. 27).  Plaintiff has further filed a reply to
plaintiff's response (Docket Entry No. 32).  For the reasons
stated below, the Magistrate Judge recommends that plaintiff's
motion for judgment be GRANTED, and that the decision of the

─────────────────

[1]Michael J. Astrue replaced Jo Anne B. Barnhart as the Commissioner of
Social Security on February 12, 2007, and is "automatically substituted" as
party defendant in this case, pursuant to Fed.R.Civ.P. 25(d)(1).

1

Commissioner be REVERSED and the cause REMANDED for further administrative proceedings consistent with this report.

## I. Introduction

Plaintiff protectively filed her DIB application on February 21, 2001, alleging disability since September 2, 1998 (Tr. 67-70). Her claim was denied initially on June 28, 2001, and again upon reconsideration, on September 25, 2001 (Tr. 38-41, 46-7). Plaintiff thereafter requested and received a hearing before an Administrative Law Judge (ALJ). On August 5, 2003, plaintiff's case was heard and testimony was received from plaintiff and her witness, as well as from an impartial vocational expert (VE) whose appearance was secured by the government (Tr. 466-508). The ALJ took plaintiff's case under advisement until October 30, 2003, when he issued a written decision finding plaintiff not disabled (Tr. 19-29). The ALJ made the following enumerated findings:

1.  The claimant meets the nondisability requirements for a period of disability and disability insurance benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since September 2, 1998.

3.  The claimant has the following severe impairment: a depressive disorder.

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in

2

Appendix 1, Subpart P, Regulation No. 4.

5.      The claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.      The claimant has the physical residual functional capacity to perform work activity at all levels of exertion.  With regard to mental limitations of function, there are no limitations in the ability to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; interact appropriately with the general public, supervisors, and coworkers; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  There are moderate limitations in the ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

7.      The claimant is unable to perform any of her past relevant work (20 CFR § 404.1565).

8.      The claimant is a younger individual between the ages of 18 and 44 (20 CFR § 404.1563).

9.      The claimant has two years of college and a degree as a registered nurse (20 CFR § 404.1564).

10.     Although the claimant has transferable skills from skilled work previously performed as described in the body of the decision, mental limitations negatively impact the transferability of these skills (20 CFR § 404.1568).

3

11. Using Medical-Vocational Rules 203.29, 202.21, and 201.28 as a framework for decision-making, there are a significant number of jobs in the national economy that the claimant could perform. Examples of such jobs include work as a parts inspector, parts packager, assembler, inspector, sorter, and bench assembler.

12. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)).

(Tr. 27-8).

On March 8, 2005, the Appeals Council denied plaintiff's request for review of the decision of the ALJ (Tr. 5-7), thereby rendering that decision the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive. Id.

## II. Review of the Record[2]

### A. Vocational Evidence

Plaintiff was born on December 14, 1969, and was thus 28 years old as of her alleged onset date of September 2, 1998 (Tr. 68). She is 37 years old at present. She is a high school graduate who went on to become a registered nurse after obtaining

---

[2]Plaintiff's brief contains a comprehensive recitation of the record evidence, encompassing some 58 pages (Docket Entry No. 23 at 2-60), which defendant does not oppose. The review undertaken in this report is the undersigned's attempt to summarize plaintiff's recitation.

4

her college degree while working full time as a claims processor at Cigna Insurance Company (Tr. 88, 110-11, 472). Her employment at Cigna was terminated in 1996 (Tr. 82), the same year that she suffered the injury which gave rise to her disability claim. She thereafter continued to work part-time as a data processor and a nurse at Bordeaux Hospital in Nashville (72-3, 79-80), but neither of these jobs were performed at the level of "substantial gainful activity" after her alleged onset date, and the ALJ so found (Tr. 27).

### B.  Medical Evidence

The earliest medical record in the administrative transcript is an August 6, 1994 emergency room report from Tennessee Christian Medical Center (Tr. 420). Plaintiff was seen at that time for "bad headaches and nausea after falling on kitchen floor," but later admitted to "her husband hitting her on the head and pulling her hair." (Id.) The right post-parietal area of her head was noted "with tenderness and hematoma," and the diagnosis was "headache." (Id.) After this episode, and prior to the accident which befell plaintiff in February 1996, her medical history was significant only for asthma (Tr. 210).

On February 21, 1996, plaintiff suffered an injury to her nose/face/head when, according to the emergency room record, an "elevator door closed abruptly on her as she was attempting to enter the elevator. Patient was snatched back from door by

friend, but nose was caught." (Tr. 142) An x-ray of the nasal bones was "suggestive of a non-displaced fracture of the anterior nasal spine," for which plaintiff was given injections of Stadol and Phenergan at the ER, as well as a prescription for Darvocet (Tr. 143). The friend who snatched plaintiff back from the elevator door, Ms. LaQuetta Fishback, completed a witness statement on May 13, 2006, wherein she related that plaintiff's nose was "bleeding profoundly, left a trail to the nearest bathroom." (Tr. 140-41)

On February 28, 1996, plaintiff was seen by her primary care physician, Dr. Raymond Fuller, D.O. (Tr. 209). On examination, Dr. Fuller noted "a nasal bone deformity with concavity on the right and convexity on the left. The nose has been pushed toward the patient's left. She is having some difficulty breathing due to swelling in the nose, and has no recurrence of epistaxis[3]." (Id.) On referral from Dr. Fuller, plaintiff was seen by Dr. Richard E. Carlson, M.D., on March 4, 1996 (Tr. 151-52). On examination, Dr. Carlson noted "an apparent non displaced nasal fracture," "a large laceration under the nasal vault on the left side with a local hematoma," and an essentially normal septum (Tr. 151). Dr. Carlson's notes further reveal that plaintiff subsequently complained of nosebleeds and a

---

[3]Epistaxis is the clinical term for a nosebleed. Dorland's Illustrated Medical Dictionary ("Dorland's") 569 (28th ed. 1994).

6

feeling that her nose was pulling or pointing to the left (Tr. 149-50).

In March and April of 1996, Dr. Fuller treated plaintiff for an exacerbation of asthma since the injury to her nose, ordering home aerosol nebulizer treatments and writing an excuse for plaintiff to miss a week of work due to her asthma (Tr. 208-09). Dr. Fuller further observed that plaintiff complained of feeling like she was about to have an emotional breakdown, and presented in a tearful and anxious state, which led Dr. Fuller to excuse her from work, stating that her absence due to emotional distress may extend for as many as six weeks (Tr. 209). Plaintiff also received treatment from Dr. Fuller for chronic sinusitis and allergic rhinitis (Tr. 205-08).

On June 12, 1996, Dr. Carlson documented plaintiff's complaints of pain in the preauricular area[4] on both sides, and his examination confirmed tenderness of the temporomandibular joints ("TMJ") (Tr. 146). Plaintiff acknowledged a "moderate amount of stress and a recent completion of school as well as grinding teeth in her sleep." (Id.) Dr. Carlson strongly advised plaintiff to take TMJ precautions. (Id.) On July 31, 1996, an associate of Dr. Carlson's, Dr. Willis, noted that plaintiff "has had increased amount of headache difficulties

---

[4]The area situated in front of the external ear. Dorland's at 161, 1345.

7

associated with eye symptoms as well as nausea and vomiting," and further noted that her "nose exam really does look improved" and that he felt her headache to be "an atypical migraine." (Tr. 145) Dr. Willis prescribed Darvocet for the headache pain (Tr. 146).

On August 19, 1996, plaintiff saw her dentist, Dr. Ted A. Beazley, reporting that she had "been having TMJ problems and headaches (severe) since accident," that she was taking Darvocet for the pain and was using an inhaler to treat her asthma, and that Dr. Carlson had recommended that she "see an orthodontist to see if her bite might be the problem" (Tr. 154). Later that month, plaintiff saw her orthodontist, Dr. Mary Cay Koen, and reported having "right jaw joint pain" when she opened her mouth wide (Tr. 167). After consulting with Dr. Koen, Dr. Beazley referred plaintiff to Dr. Greg Richardson for evaluation of plaintiff's "chief complaint" of "TMJ problems and headaches," while noting that he and Dr. Koen were in "general agreement ... that the accident aggravated a preexisting condition due to a history of bruxism.[5] Orthodontically the teeth were not in bad alignment resulting in balancing interferences." (Tr. 154)

On September 11, 1996, Dr. Fuller examined plaintiff

---

[5]Bruxism is "an oral habit consisting of involuntary rhythmic or spasmodic nonfunctional gnashing, grinding, and clenching of teeth in other than chewing movements of the mandible, usually performed during sleep, which may lead to occlusal trauma. Causes are believed to be related to repressed aggression, emotional tension, anger, fear, and frustration." Dorland's at 233.

8

and recorded her complaints as follows:

> Tina was seen today complaining of severe headache,
> photophobia, nausea, and intractable vomiting.
> Approximately ½ an hour after she woke up this morning,
> she noticed a severe migraine headache over the left
> hemicranium.  There was a "zig zag deformity" of vision
> without blind spot.  She noted also that she was
> wheezing and coughing and in fact, her asthma and
> hypoxemia may have transiently triggered her migraine
> headache.

(Tr. 204)  Dr. Fuller diagnosed "migraine headache" and

administered an injection of Imitrex and Phenergan, after which

plaintiff's symptoms improved.  (Id.)  Two days later, plaintiff

reported that she was still having migraines, and Dr. Fuller

again administered an injection of Imitrex (Tr. 203, 206).

Plaintiff was prescribed a drug to prevent the headaches (Midrin)

and Darvocet for headache pain (Tr. 203).

Plaintiff went back to Dr. Koen on September 16, 1996,

again complaining of migraine headaches (Tr. 167).

On September 24, 1996, plaintiff was seen by Dr.

Richardson, an oral surgeon.  She complained of frequent

headaches that became severe, jaw popping, jaw muscle swelling

occasionally resulting in the inability to eat, and pain that at

times reached 8 on a 10-point scale on the right side of her

face/head, and that was a 2 on the left side (Tr. 161-63).  On

examination, Dr. Richardson found that "on opening, she has a

light click in the right side with a reciprocal component.  Her

occlusion is Class I stable and reproducible."  (Tr. 165)  Dr.

Richardson "explained that she has an internal derangement in the
right joint characterized by reducing disc displacement ...
[which] may or may have not been a result of the trauma." (Id.)
Dr. Richardson recommended that plaintiff have an MRI "to assess
the exact position of the meniscus." (Id.)

On October 23, 1996, plaintiff was seen by Dr. Fuller,
who diagnosed and prescribed treatment for acute asthma (Tr.
203). On November 15, 1996, plaintiff returned to Dr. Fuller's
office, where she was seen by a Licensed Practical Nurse (LPN)
for complaints of a two-day headache, depression, increased
asthma attacks, and a confrontation with her supervisor at work
(Tr. 200-01). The LPN diagnosed asthma and migraine, and
prescribed an antibiotic to treat a double ear infection. (Id.)

On April 28, 1997, plaintiff presented to Dr. Fuller
complaining of a headache for three days, as well as upper
respiratory symptoms (Tr. 199). Dr. Fuller prescribed an
injection of the narcotic painkiller Toradol. (Id.) Plaintiff
was seen on May 2, 1997, in follow-up for her headaches, at which
time she reported having a severe headache, a draining nose, a
painful right side of her face caused by her braces being
tightened the day before, and no improvement of her headache with
Imitrex (Tr. 198). On May 7, 1997, Dr. Fuller again saw
plaintiff and noted that her asthma was acting up and had kept
her from sleeping for 2-3 nights (Tr. 197).

10

In a statement dated June 25, 1997, Dr. Koen wrote that it was "highly probable" that plaintiff's "dysfunctional, painful temporomandibular joints" were caused by the trauma from her accident (Tr. 170). Dr. Koen noted that "[o]nce joint trauma has occurred other factors such as dental malalignment and bruxism can potentiate the problem," and that plaintiff's "initial panoramic x-ray did demonstrate irregular condylar heads which is a finding often consistent with dysfunctional temporomandibular joints." (Id.)

On September 30, 1997, Dr. Fuller noted that plaintiff was "still having headaches with jaws hurting," seeing an orthodontist, and experiencing "persistent [bilateral] temporomandibular joint pain!" (Tr. 196) Plaintiff reported being unable to work due to the headaches, though she was able to walk four miles daily. (Id.)

On April 16, 1998, plaintiff was injured in a motor vehicle accident (Tr. 171-72). An x-ray exam of plaintiff's cervical spine showed end plate changes between the sixth and seventh cervical vertebrae and some straightening of the cervical spine (Tr. 173). The diagnosis was cervical sprain, and plaintiff was prescribed a soft neck collar and Lortab 5.0, a narcotic painkiller (Tr. 172). When plaintiff saw Dr. Fuller in follow-up on April 28, 1997, he prescribed physical therapy (Tr. 195).

11

On May 22, 1998, plaintiff began treatment with Dr. Daniel Hixon, D.M.D. (Tr. 176-78, 393-99), a dentist with some degree of focus on craniomandibular dysfunction (Tr. 352). Plaintiff complained of headaches, jaw pain, and nausea since her accident in February 1996. Dr. Hixon noted that her "muscles are the real problems" and that "Dr. Palmer did multiple injections intraorally" (Tr. 397). Dr. Hixon's diagnosis was myospasm of the masseter and temporalis muscles bilaterally, with "myalgia/myositis" (Tr. 399). Dr. Hixon referred plaintiff to physical therapy (Tr. 400).

When Dr. Hixon saw plaintiff in follow-up on July 24, 1998, she was experiencing pain in the right masseter muscle from the ear back (Tr. 174). Apparently the physical therapist had observed degeneration of this masseter muscle, and it was decided to attempt nerve stimulation and iontophoresis[6]; unfortunately, plaintiff apparently got sick the day after iontophoresis was conducted. (Id.) Dr. Hixon further noted on August 21, 1998, that Dr. Koen was going to remove and replace plaintiff's orthodontic brackets in order to shift her teeth down on the left side. (Id.)

On December 4, 1998, plaintiff told Dr. Hixon that she could not longer afford to go to physical therapy, and that while

---

[6]Iontophoresis is "the introduction by means of the electric current, of ions of soluble salts into the tissues of the body, often for therapeutic purposes[.]" Dorland's at 857-58.

12

it had helped with her neck, she got sick every time they tried to work on her jaw (Tr. 174-75). Dr. Hixon noted that plaintiff had good orthodontic position, and that it was time to make retainers (Tr. 175). He prescribed half a Lortab a day. (Id.)

In early 1999, Dr. Hixon referred plaintiff to Dr. Kenneth E. Bartholomew, M.D., for pain management (Tr. 175, 384-85). On February 1, 1999, plaintiff presented to Dr. Bartholomew with a chief complaint of chronic headaches (Tr. 384). Dr. Bartholomew recited plaintiff's subjective complaints as follows:

> The patient now reports that she has severe headaches, which begin in the right TMJ region, anterior to the TMJ where the superior molars would lie. This headache pain radiates superiorly over the right temporal and forehead region and into the right occiput. She has pain 90% of the time, which she rates at a 5 or 6/10 on the VAS. Occasionally she has pain that will increase dramatically and is rated at a 10/10. She has throbbing in this region essentially 100% of the time. She awakens in the morning with her headaches and as the day progresses her headache will increase. If it is not treated she will ultimately develop nausea and vomiting. Her right ear hurts as well. There is photophobia, sonophobia and hyperesthesia to touch with the headaches. She reports that her pain is at its greatest when there are weather changes and when she talks too much or chews too much. Alleviating factors are identified only as pain medications and sleep. She describes her pain as throbbing, shooting, stabbing, sharp, cramping, aching, splitting, exhausting, and sickening.

(Tr. 384) On examination, Dr. Bartholomew noted as follows:

> There is exquisite tenderness in the right greater occipital nerve region, specifically in the orbiculare nerve branch. There is also exquisite tenderness of the right mastoid process, right TMJ and just anteriorly to the TMJ overlying the maxillae. There are no obvious deformities. There is a palpable right

13

temporal artery pulse.  Jaw opening is to 2 finger
breadths only.

(Tr. 385)  Dr. Bartholomew diagnosed "facial pain status post

trauma," "vascular headaches-migraine variant," "possible

neuropathically mediated pain," depression, and sleep

disturbance.  (<u>Id.</u>)  Among the treatments ordered was a beta-

blocker trial, beginning with Inderal LA.  (<u>Id.</u>)

When plaintiff returned to Dr. Bartholomew's office on

February 24, 1999, she reported "an 85% overall improvement of

her chronic headaches and right facial pain since we started the

Inderal LA 80 mg per day." (Tr. 180)  She reported having had

"only two headaches since February 1 of this year and she feels

these have been sinus headaches and not right-sided vascular

headaches."  (<u>Id.</u>)  She was "very happy in the progress she has

made," and stated that "she has spent the last two and a half

years battling her pain and this is the first significant relief

she has obtained."  (<u>Id.</u>)  She did report having a "mild problem

with orthostatic hypotension when arising from a sitting

position," and requested that he lower the dose of the Inderal

(<u>Id.</u>).  Dr. Bartholomew's physical exam revealed "localized

tenderness, just anterior to the right TMJ region," no swelling

or induration, and "mild popping when opening of right jaw."

(<u>Id.</u>)  His impression was that plaintiff suffered from chronic

right TMJ pain, "vascular headaches-migraine variant,"

depression, and sleep disturbance, the last three of which were

14

improved (Id.).  Dr. Bartholomew's plan was to reduce the Inderal
from 80 mg per day to 60 mg per day, to have her Inderal refilled
by her family physician, and for her to return to see him as
needed.  He discussed steroid and local anesthetic injections
with plaintiff, but noted that she had "some documented TMJ
destruction secondary to repeated injections in the past," and
that "obviously she wishes to avoid further injections."  (Id.)

    When plaintiff saw Dr. Fuller on March 9, 1999, she
reported headaches, right jaw pain, sinus congestion, ear ache,
and that she was not sleeping well (Tr. 193).  Dr. Fuller noted
that Propanolol (Inderal) has helped control her blood pressure
and her headaches.  (Id.)  When plaintiff saw Dr. Fuller again on
April 28, 1999, she had had her braces removed six days earlier
and was having pain and muscle spasms in her jaw, and headaches
(Tr. 192).  Apparently at that time, Dr. Fuller prescribed
Oxycontin, a morphine-based narcotic painkiller, since the
orthodontist had not prescribed anything for the pain.  (Id.)  On
May 10, 1999, plaintiff reported to Dr. Fuller that the Oxycontin
was too strong and made her "zoo-zoo"; accordingly, Dr. Fuller
prescribed Lortab and Soma (a muscle relaxant) for pain control,
upon diagnosing "TMJ - post traumatic pain syndrome" (Tr. 191).

    Dr. Hixon wrote additional prescriptions for Lortab on
July 13, 1999, and August 5, 1999 (Tr. 175).  It further appears
that Dr. Hixon ordered an impression to be taken for an "upper

15

splint," which he directed to be made "heavy in front." (Id.)

On June 9, 2000, plaintiff presented as a new patient to Dr. Clay Ferguson, M.D. (Tr. 217). Her chief complaint was "left jaw pain and ear pain x 2 days." (Id.) Dr. Ferguson assessed "chronic jaw and sinus problems" and prescribed Lortab 5, though he instructed plaintiff not to take the medication while breast feeding her infant. (Id.)

Dr. Hixon's notes reflect visits from plaintiff in July, September, and October of 2000, related to the adjustment of her appliances (Tr. 175).

Plaintiff presented to Dr. Ferguson's office on February 22, 2001, with a migraine producing mild nausea/vomiting (Tr. 216). Dr. Ferguson diagnosed "migraine headache," administered an injection of the narcotic painkiller Stadol, and advised plaintiff to follow up at the emergency room if her headache persisted or worsened. (Id.)

On May 4, 2001, plaintiff was seen by a consultative examiner hired by the government, Dr. Shawn L. Reed, M.D. (Tr. 218-20). Dr. Reed did not have access to plaintiff's medical records, but recorded her complaints of occasional visual disturbance with blurred vision, ear ache, vomiting "frequently at times with her headaches," and her jaw locking up at times (Tr. 219). After observing no signs of any reconstructive surgery, Dr. Reed noted that he thought "the term she used of her

16

nose being pulled off her face is a gross exaggeration on her part." (Id.) He further recorded an essentially normal physical examination, other than the decreased visual acuity in plaintiff's right eye (20/100). (Id.) Dr. Reed's impressions included "[s]tatus post closed head injury 5 years ago due to an elevator closing on her head," "[a]pparently some degree of jaw arthritis and possibly even dislocation as well as subsequent migraines due to this, which have caused the patient some continued problems," and "depression." (Id.) Dr. Reed concluded that plaintiff was fit for work, other than perhaps her nursing work, due to "some subtle memory difficulties due to the closed head injury." (Tr. 220)

On June 7, 2001, plaintiff was seen by a consultative psychological examiner hired by the government, Dr. Deborah E. Doineau, Ed.D. (Tr. 221-25). The only documentation which was provided for Dr. Doineau's review was the report of Dr. Reed, the consulting physician (Tr. 221). Dr. Doineau recorded plaintiff's report of physical symptoms, as follows:

> When she returned to work [following the accident], she found herself suffering splitting headaches and frequent nose bleeds. She was eventually fired in 1998 as she was not able to keep up to work standareds. She attempted to work at home to compensate her income loss performing medical transcription work but kept getting sick with headaches. She also had nerve damage to her mouth and pain shooting through her head with throbbing in her teeth. She also suffered chronic vomiting.

(Tr. 222) Dr. Doineau was informed that plaintiff had never had

17

nor sought any psychiatric treatment, and had never attempted suicide, but had experienced suicidal thoughts. (_Id._) Plaintiff further informed Dr. Doineau that she had no history of abuse or neglect. (_Id._) Plaintiff's mental status was normal, other than her tearful presentation and "mildly dysphoric" mood as she talked about her problems (Tr. 223). Dr. Doineau gave the following assessment:

> Ms. Gryglewski is capable of understanding instructions. She appears to have moderate impairment in her ability to concentrate consistently. Persistence and motivation appear to be affected primarily by her physical condition. She appears to have mild impairment in her ability to remember consistently. She is capable of maintaining an adequate level of hygiene. She is capable of using public transportation without assistance. She is capable of adapting.

(Tr. 224) Dr. Doineau further found plaintiff capable of managing funds, and diagnosed her with "Major depressive [disorder], single episode, moderate with symptoms of anxiety and possible somatization tendencies." (Tr. 225)

Plaintiff next saw Dr. Ferguson on November 29, 2001, at which time she stated that "for the last six days, her pain has been uncontrollable." (Tr. 422-23) She stated that Lortab had helped her in the past, and requested that he give her some. (_Id._) Dr. Ferguson's physical exam revealed "bilateral TMJ pain with palpation and jaw manipulation." (_Id._) He diagnosed "TMJ dysfunction," and prescribed the narcotic Ultracet and the muscle relaxant Skelaxin. (_Id._)

18

On February 19, 2002, Dr. Hixon wrote a letter in which
he stated that plaintiff's case was:

> ...very unusual and frankly I've never seen its like.
> The tremendous pressure exerted by the weight and angle
> of the elevator door closure on her face has caused a
> condition that will not improve. She has had every
> treatment short of surgery and I don't know of a
> surgical solution. My opinion is that she will have to
> live with the disabilities created by the accident.

(Tr. 390)

On July 18, 2002, plaintiff went to Dr. Ferguson's
office to talk to the doctor about "nerves." (Tr. 424) Dr.
Ferguson diagnosed "depression/anxiety" and migraine headache.
(Id.) He prescribed Lortab, the antidepressant Celexa, and Xanax
for anxiety. (Id.)

On plaintiff's next and, for purposes of this record,
final few visits to Dr. Ferguson's office, she was seen and
treated by a physician's assistant, Cathy A. Carraway, PA-C (Tr.
425-28). The notes from these visits reflect the continued
dispensation of Lortab for pain control, while also reflecting
concerns with narcotic overuse/habituation from both plaintiff
and Ms. Carraway, with the latter recording the understanding
that plaintiff generally took her Lortab 7.5 pills in half-tablet
doses. (Id.) These notes also reveal that plaintiff's severe
myopia in one eye had produced an optometrist's recommendation
that she have laser vision surgery because "she is only 1 size
away from the last contact lens that is made." (Tr. 426) Ms.

Carraway's final assessment of plaintiff's conditions were "chronic right TMJ pain secondary to previous jaw dislocation," "chronic daily migraine," and "depression secondary to chronic pain." (Tr. 428)

By letter dated September 5, 2003 (Tr. 443), Pam Arnell, M.A., of Arnell's Counseling Services, opined as to plaintiff's mental health, which she had occasion to observe in the course of providing services as a counselor to the Gryglewski family (not as plaintiff's individual counselor). Ms. Arnell opined as follows:

> It is apparent that during the time of counseling, Mrs. Gryglewski developed nightmares related to her past experience of being sexually abused. There were other traumatic experiences that developed during the course of counseling that Mrs. Gryglewski developed. Some of the experiences included anxiety, panic attacks, regressing from social outings and depression.
>
> It is recommended that Mrs. Gryglewski continue counseling with Arnell's Counseling Service for an indefinite period of time. The areas that should be addressed are recurring nightmares, heightened levels of anxiety, trust issues, irrational thoughts and spousal counseling.

(Id.)

On June 14, 2002, Dr. Hixon was deposed in conjunction with plaintiff's case against the elevator manufacturer, and the transcript of that deposition (Tr. 273-377) is extensively summarized in plaintiff's brief (Docket Entry No. 23 at 23-32). While such details of Dr. Hixon's deposition testimony are not replicated here, the testimony that is relevant to the legal

20

issues in this case is discussed _infra_.

On July 31, 2001, Dr. Hixon completed disability forms at plaintiff's request, wherein he opined as to plaintiff's work-related _mental_ limitations, despite his degree and practice in dentistry (Tr. 245-49). However, by way of explanation for his assessment of some highly restrictive mental limitations, Dr. Hixon referred back to his medical records (Tr. 246), and specifically ascribed such limitations to the level of pain plaintiff experiences and the measures taken to combat the pain, as follows:

> When patient has migraines and/or TM joint related pain she is effectively 90% disabled. She can get to the bathroom to vomit. She loses track of time and days and is unreliable. Tina has had 4 days in year 2000 [without] pain. Any medication causes nausea, sleeplessness and agitation. I could not imagine sending her into the workplace.

(Tr. 249)

On August 29, 2001, Dr. Ferguson filled out some of the same forms as Dr. Hixon, and agreed that plaintiff suffered from an anxiety disorder and a depressive disorder, while likewise supporting his evaluation by reference to plaintiff's "ongoing migraine headaches" and "TMJ dysfunction." (Tr. 251-53)

On August 29, 2003, Ms. Arnell completed a "Mental Disorders Questionnaire" at plaintiff's request (Tr. 433-34), wherein she opined that plaintiff suffered from a depressive syndrome characterized by anhedonia or pervasive loss of interest

21

in almost all activities, appetite disturbance with change in weight, sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. She further opined that plaintiff suffered from anxiety-related symptoms, including recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week, recurrent obsessions or compulsions which are a source of marked distress, and recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress. (Tr. 433) Ms. Arnell further assessed plaintiff with marked restriction of activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence or pace (as manifested during "pre-trial activities"), and repeated, enduring episodes of decompensation (associated with "trial assessment and investigation"). (Tr. 433-34)

## C. Testimonial Evidence

Plaintiff testified at her hearing that when she was pulled back from the elevator doors, "it pulled the, my nose off my face." (Tr. 481-82) She went on to clarify that her skin remained intact and that no reconstructive surgery was required, but that due to the nasal fracture, her nose "was, like, hanging down with, like, a flap of skin," sideways on her face (Tr. 482-

22

83). Plaintiff explained that she was able to work for nearly three years after the February 1996 injury because Dr. Palmer kept giving her medication to numb her jaw, which plaintiff described as a "band-aid ... just to get by." (Tr. 484) She testified that the Propanolol (Inderal) that Dr. Bartholomew had prescribed was the only drug that had ever truly controlled her pain, but she had to stop taking it because it "bottomed out" her blood pressure, making her feel "sluggish and just bad all the time." (Tr. 484-85)

Plaintiff testified that her continuing symptoms were "chronic migraines" with associated nausea and vomiting, depression, and problems with her ears, eyes, and mouth (Tr. 485-86). She testified that she eats mostly soups because of difficulty chewing or even opening her mouth wide enough to enjoy most solid foods (Tr. 486). She testified that it seemed like she had a migraine every day, and that she experienced nausea and vomiting just about every time she had a headache. (Id.) She testified that she had good and bad days as far as dealing with pain, and that her current medications included Lortab, Xanax, and Benadryl (Tr. 488). She testified that the Lortab made her sleepy, but that she still had problems sleeping at night, for which she took the Benadryl. (Id.)

Plaintiff testified that her only contacts with people outside of her home were the people she saw at church and her

23

friend Karen Kaeb (Tr. 489). She testified that she had a bonus room in her house with a bed in the corner, so that when she had a headache she could lay down in the same room where her children played. (Id.) She further testified that when she has severe headaches that last for days, she goes to her personal physician to get an injection or other treatment. (Id.)

Ms. Karen Kaeb testified on plaintiff's behalf at the hearing, based on their friendship that developed during and after plaintiff's representation by the lawyer for whom Ms. Kaeb is a paralegal (Tr. 491-92). Ms. Kaeb communicates with plaintiff mostly via e-mail, to a lesser extent via telephone, and only sees her in person once every 6-8 weeks (Tr. 492-93). During these communications, plaintiff almost always mentions her migraine headache pain (Tr. 499).

Finally, the VE identified plaintiff's past relevant jobs as either semi-skilled or skilled; testified that the evidence of plaintiff's mental impairments would preclude such work; and, testified to the existence of a significant number of other jobs which a person with no physical limitations and only moderate mental limitations could perform. (Tr. 502-05) The VE further testified that the limitations identified in the assessments of treating Drs. Ferguson and Hixon would preclude all work (Tr. 505-06). On cross-examination, plaintiff's counsel asked the VE what the effect would be if a person "at least twice

24

a month, will have migraine headaches which force them to seek a quiet dark room where they lie down for a minimum of three or four hours." (Tr. 506-07) In response, the VE testified that "[t]hat would result in an inability to maintain the jobs, simply because of a, what I perceive to be, an absenteeism problem of having to leave work twice a month, miss two days out of the month." (Tr. 507) The VE agreed that a person suffering severe, daily migraine headaches as described by plaintiff would be incapable of sustained work performance. (Id.)

### III. Conclusions of Law

#### A. Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. Jones v. Sec'y of Health & Human Servs., 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. Landsaw v. Sec'y of Health & Human Servs., 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th

Cir. 1999)(<u>citing</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." <u>Bell v. Comm'r of Soc. Sec.</u>, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. <u>Her</u>, 203 F.3d at 389 (<u>citing</u> <u>Key v. Callahan</u>, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. <u>Hurst v. Sec'y of Health & Human Servs.</u>, 753 F.2d 517, 519 (6th Cir. 1985).

B.  <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process, as follows:

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

26

(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[7] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.
(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a <u>prima facie</u> case of disability.
(5)  Once the claimant establishes a <u>prima facie</u> case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

<u>Moon v. Sullivan</u>, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule.  Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination.  <u>Id.</u>  In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's <u>prima facie</u> case by coming forward with particularized

---

[7]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

Case 3:05-cv-00366   Document 34   Filed 03/22/07   Page 27 of 41 PageID #: 392

proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony.  See Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  See 42 U.S.C. § 423(d)(2)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

C.  Plaintiff's Statement of Errors

Plaintiff alleges error in the ALJ's finding that her only "severe" impairment was her depressive disorder; in his failure to consider all relevant evidence in reducing the matter to "strictly a subjective pain case" (Tr. 25); in his evaluation of the evidence from plaintiff's treating sources; and, in his evaluation of plaintiff's subjective complaints of disabling pain.  These allegations of error are largely interrelated, each undergirded by the proposition that the ALJ improperly analyzed plaintiff's pain and its impact on her ability to work eight hours a day, five days a week.  Upon review, the undersigned concurs that the ALJ erred in his analysis of plaintiff's subjective complaints versus the objective medical evidence, and concludes that remand for further administrative proceedings is

28

in order.

It is clear that pain alone, if it results from a medically determinable impairment, can render an individual disabled. E.g., <u>King v. Heckler</u>, 742 F.2d 968, 975 (1984). It is likewise clear that subjective allegations are not alone sufficient to establish the existence of a disabling level of pain; the objective medical proof must to some extent be in accord. 20 C.F.R. § 404.1529(a). Accordingly, the Sixth Circuit has long required that there first be objective medical proof of an underlying medical condition; if there is, the disabling severity of the pain alleged to result from that condition must either (1) be confirmed by the objective medical evidence, or (2) be reasonably expected to result given the severity of the condition, as established by the medical and nonmedical evidence of record. <u>See</u>, <u>e.g.</u>, <u>Duncan v. Sec'y of Health & Human Servs.</u>, 801 F.2d 847, 853 (6th Cir. 1986).

"In evaluating complaints of pain, an ALJ may properly consider the credibility of the claimant." <u>Walters v. Comm'r of Soc. Sec.</u>, 127 F.3d 525, 531 (6th Cir. 1997). Where there is a paucity of objective support for the claimant's allegations, credibility does indeed become an even more vital element in the disability analysis, and the court will generally defer to an adequately supported credibility finding in such circumstances. <u>Id.</u> However, unless the claimant's medically determinable

29

impairments are truly de minimis, her claim will not rise or fall

solely on the candor of her representations to the government,

but instead must be subjected to the analysis of the entire

record prescribed in 20 C.F.R. § 404.1529.[8] <u>Id.</u> (noting the

applicability of § 404.1529 despite "very little objective,

physical, or clinical evidence of disabling severity, and no

medical evidence ... suggesting that Walters's medical conditions

can reasonably be expected to produce the alleged disabling

pain."); <u>Felisky v. Bowen</u>, 35 F.3d 1027, 1037-41 (6th Cir. 1994);

<u>Social Security Ruling 96-7p</u>, 1996 WL 362209, 61 Fed. Reg. 34483,

at *34484-34485 (describing the scope of the analysis as

including "the medical signs and laboratory findings, the

individual's own statements about the symptoms, any statements

and other information provided by treating or examining

physicians or psychologists or other persons about the symptoms

---

[8]Section 404.1529(c) provides that, "[w]hen the medical signs or
laboratory findings show that you have a medically determinable impairment(s)
that could reasonably be expected to produce your symptoms, such as pain," the
entire record of medical and nonmedical evidence will be considered in
evaluating the intensity and persistence of those symptoms, including the
following factors:
    (i) Your daily activities;
    (ii) The location, duration, frequency, and intensity of your pain or
other symptoms;
    (iii) Precipitating and aggravating factors;
    (iv) The type, dosage, effectiveness, and side effects of any medication
you take or have taken to alleviate your pain or other symptoms;
    (v) Treatment, other than medication, you receive or have received for
relief of your pain or other symptoms;
    (vi) Any measures you use of have used to relieve your pain or other
symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every
hour, sleeping on a board, etc.); and
    (vii) Other factors concerning your functional limitations and
restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

and how they affect the individual, and any other relevant evidence in the case record"; "[A] finding that an individual's statements are not credible, or not wholly credible, is not in itself sufficient to establish that the individual is not disabled.").

Regarding the sufficiency of the objective medical evidence, the parties first quarrel over whether the ALJ erred in finding plaintiff's migraine headaches and TMJ dysfunction to be "nonsevere" and therefore de minimis impairments. <u>E.g.</u>, <u>Higgs v. Bowen</u>, 880 F.2d 860, 862-63 (6th Cir. 1988). With all due respect, these impairments – which required treatment with orthodontic fixtures, emergency narcotic injections, and the near continuous prescription of narcotic pain pills[9] – are clearly not de minimis, and the finding of nonseverity is plainly unfounded. Defendant argues that any such error in labeling individual

---

[9]Both the ALJ and the government on brief cite Dr. Bartholomew's February 1999 note that plaintiff had experienced an "85% overall improvement of her chronic headaches and right facial pain" with the beta-blocker medication Inderal (Tr. 180). However, neither the ALJ nor the government addresses plaintiff's testimony that the Inderal prescription had to be discontinued due to the side effect of lowered blood pressure (Tr. 485), as further reflected in Dr. Bartholomew's reference to "orthostatic hypotension" (Tr. 180), as well as the fact that plaintiff thereafter resumed treatment with narcotic painkillers. While the government further argues that plaintiff "discontinued all pain management efforts, with Dr. Bartholomew and others" following the prescription of Inderal (Docket Entry No. 27 at 7 (citing Tr. 330-34)), such is plainly not the case. While there is a gap in treatment of plaintiff's pain between Dr. Hixon's refill prescription of 60 Lortab pills on August 5, 1999 (Tr. 405) and plaintiff's presentation as a new patient to Dr. Ferguson on June 9, 2000 (Tr. 217), that time period appears to correspond to plaintiff's pregnancy with her second child. <u>Cf.</u> Tr. 217 (note dated June 9, 2000, when plaintiff was advised against taking Lortab while breast feeding her infant) <u>with</u> Tr. 223, 224 (consultative examination dated June 7, 2001, when plaintiff's child noted to be 12 months old).

31

impairments "nonsevere" is cured by the consideration of the combined functional effects of such impairments at the succeeding steps of the sequential evaluation process. Citing Sullivan v. Zebley, 493 U.S. 521, 532-35 (1990), and 20 C.F.R. §§ 404.1520, 404.1523. This is true as far as it goes, but as pointed out in plaintiff's reply brief, as well as the discussion below, such functional effects were not duly considered by the ALJ in this case.

Having found that plaintiff did not suffer from any "severe" physical impairment, the ALJ apparently proceeded on the assumption that he was free to analyze the credibility of plaintiff's statements regarding her headache and TMJ pain without reference to the factors identified in § 404.1529. Neither that regulation nor the Social Security Ruling interpreting it, Ruling 96-7p, are cited in the ALJ's decision. It seems that the ALJ did not believe that plaintiff had any significant difficulty with headache and facial pain, at any significant frequency, despite having credited the assessment of enduring, moderate limitations in the ability to concentrate on and persist with regular work tasks due primarily to her physical symptoms (Tr. 223-24). The ALJ's full treatment of the subject is contained in the following excerpts from his opinion:

> The claimant alleges disability due to TMJ, migraine headaches, and depression, as well as problems with her ears and eyes. However, her subjective symptoms, including pain, are not supported by the objective

32

evidence of record as a whole as to preclude the
ability to perform work activity at all levels of
exertion.  There are secondary gain issues beginning
with a lawsuit against Eakin & Smith, et al, arising
out of an alleged elevator injury; workman's
compensation claim against Cigna, her employer at the
time of the injury to her nose; short term disability
claim; and her claim for Social Security disability.
The claimant alleges severe injury to her face, head
and particularly nose occurring when an elevator closed
on her face.  Despite dramatic testimony that her nose
was torn off, etc., the medical evidence indicates only
a "slight suggestion of 'step-off' of the anterior
nasal spine suggestive of non-displaced nasal
fracture."  Additionally, she had a laceration under
the nasal vault on the left side with hematoma which
was intentionally left untreated and which apparently
healed without complication.  When seen by Dr. Fuller
on April 15, 1996, and diagnosed with allergy rhinitis
less than two months after incident, the accident
barely rated a mention in his notes.  Claimant
continued to work for two and a half years after the
incident.  At the consultative examination in May 2001,
Dr. Reed found no basis on which to give restrictions
as to work capacity.

The claimant may have some TMJ difficulties but Dr.
Hixon's deposition pretty clearly establishes that the
objective evidence of that is lacking and her
subjective complaints were not explained by objective
testing.  She has seen a variety of dentists and
orthodontists for treatment mostly from 1998 or so, but
their records are missing or incomplete in the record.
Of significance, Dr. Hixon, a treating dentist,
referred the claimant to Dr. Bartholomew, a pain
specialist, and on cross-examination testified that he
had "no doubt" that the claimant was addicted to
Lortab, and that, on February 12, 2002, he switched her
from Lortab to Tylenol 3 because he believed that her
addiction (to Lortab) was more of a problem than was
her pain.

* * *

This is strictly a subjective pain case in which
credibility is essential to success.  I found the
claimant to be very evasive in answering questions
particularly about the duration of her work activity

33

(which continued to an indeterminate date after her
alleged onset date). She was vague, contradictory and
incomplete in her testimony and seldom made eye contact
when responding to direct questions. As to her report
and testimony of alleged surgical history resulting
from her "nose being pulled off her face" injury, I am
unable to confirm any such history in the medical
record and to the contrary find only a relatively minor
non-displaced nose fracture and laceration. She
retains no scarring or other signs of facial injury.
Also of note, despite testimony from claimant at
hearing of **physical abuse** at the hands of her alcoholic
father and **sexual abuse** lasting 2 years at ages 8-9 at
the hands of her step-father, the claimant reported to
Dr. Doineau "no history of abuse or neglect." The
claimant's evasiveness, lack of candor and
inconsistencies establish a lack of credibility and I
so find.

(Tr. 24-25)(emphasis in original; internal citations omitted)

As noted above, the ALJ's credibility finding is due

great deference, particularly since he had the opportunity to

observe plaintiff's demeanor while testifying. Jones v. Comm'r

of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003). Thus, the court

is limited to evaluating whether or not the ALJ's reasons for

discrediting plaintiff are reasonable and supported by

substantial evidence in the record. Id. At the same time,

however, if the record contains objective medical evidence

establishing a medically determinable impairment reasonably

capable of producing the symptoms alleged by plaintiff, the

denial of benefits must be supported by more than just the

finding that plaintiff's statements are not worthy of credence.

As to the reasons given by the ALJ in support of his

finding that plaintiff was not credible, the "secondary gain

34

issues" were reasonably noted, though they properly did not appear to weigh heavily in the ALJ's analysis, as there is no indication that any medical source felt plaintiff to be exaggerating anything other than her account of the trauma to her nose. Though plaintiff's account of her nose being pulled off her face was dramatic in comparison to the actual physical trauma that occurred, she explained at the hearing that, due to the nasal fracture, her nose cartilage was hanging by the unbroken skin, down and to the left side (Tr. 481-83). The ALJ seemed to dwell on the relative nonseverity of the injury to plaintiff's nose in comparison to her allegations of functional limitation, also citing her ability to work for two and a half years after sustaining the injury, and the consultative examiner's assessment of no exertional restrictions. However, it is not the prior injury to her nose that allegedly keeps plaintiff from working, but the headaches and TMJ symptoms allegedly resulting from that injury. Moreover, as plaintiff notes in her brief, her ability to work after the injury can be viewed as perseverance bolstering her credibility. King, 742 F.2d at 975 n.3 (noting that "[appellant's] return to work after his 1978 fall despite his continued pain, does not readily support an inference that appellant is a malingerer."). Thus, these observations regarding the severity of the injury itself, while reasonably noted, do not appear to lend particularly substantial support to the ALJ's

35

credibility finding.

Nonetheless, the ALJ's citation to inconsistencies in plaintiff's statements about her work history and history of being abused, as well as her demeanor while testifying,[10] appears to provide the substantial evidentiary support needed to sustain his credibility finding. Unfortunately, the ALJ appears to have deemed this finding to be dispositive of the issue of plaintiff's pain, along with the general remark that "her subjective symptoms, including pain, are not supported by the objective evidence of record as a whole as to preclude the ability to perform work activity at all levels of exertion." (Tr. 24) The ALJ elsewhere noted that "her subjective complaints [to Dr. Hixon] were not explained by objective testing," and that plaintiff's pain medication had to be switched from Lortab to Tylenol 3 because she had become addicted to Lortab. (Id.) Of course, there is no requirement that the severity of pain be confirmed or explained by the objective medical evidence. Jones v. Sec'y of Health & Human Servs., 945 F.2d 1365, 1369-70 (6th Cir. 1991). Rather, the regulations and Sixth Circuit law

---

[10]The ALJ cited plaintiff's lack of eye contact when responding to direct questions as undermining the credibility of her hearing testimony (Tr. 25). While not particularly significant to this Court's review of the ALJ's credibility determination, it bears noting for the sake of context that, in 1997, Dr. Fuller observed that plaintiff "doesn't make eye contact" during a routine office visit regarding plaintiff's asthma and ear infections (Tr. 197), when she presumably had no interest in misleading the doctor or exaggerating her symptoms. In any event, the ALJ's partial reliance on his observations of plaintiff while she was testifying was reasonable and entirely within his – and not this Court's – province.

36

prescribe a standard that merely begins with the objective medical record, and goes on to encompass all relevant evidence. Id.; Felisky, 35 F.3d at 1037-41.[11]

Pursuant to this standard, it is clear that plaintiff has an underlying medical condition: TMJ dysfunction, caused or exacerbated by the 1996 accident. On September 24, 1996, Dr. Richardson diagnosed internal derangement of the right TMJ characterized by reducing disk displacement (Tr. 165). On June 25, 1997, Dr. Koen wrote that plaintiff's initial panoramic x-ray demonstrated irregular condylar heads consistent with TMJ dysfunction (Tr. 170). Dr. Hixon testified that x-rays showed that the condyle was unusually positioned so that it looked as if plaintiff's jaw had been pulled down (Tr. 283). As far as objective medical evidence of the pain which this condition caused, Dr. Hixon appreciated muscle spasms in the masseter, temporalis, and pterygoid muscles (Tr. 174, 282-87, 396, 399) and noted that they were her worst problem (Tr. 174, 311, 397). The right masseter muscle was noted to be degenerating (Tr. 174), with "documented TMJ destruction secondary to repeated [painkilling] injections in the past." (Tr. 180) Plaintiff's jaw has also been described as having been dislocated (Tr. 428). On February 1, 1999, Dr. Bartholomew examined plaintiff and

_____

[11]The court in Felisky found that the Sixth Circuit's standard for analysis of pain complaints is simply "a more succinct form" of the standard established in 20 C.F.R. § 404.1529. 35 F.3d at 1038-39.

appreciated "exquisite tenderness" around the right TMJ (Tr. 181). On November 29, 2001, Dr. Ferguson noted "[b]ilateral TMJ pain with palpation and jaw manipulation" (Tr. 422). As far as medical and other evidence which would support the reasonable expectation that plaintiff's condition could result in the level of pain she describes, the medical sources agree that plaintiff's TMJ dysfunction and related muscle spasms could cause her migraine headaches (Tr. 219, 362-63, 366, 368, 428), which have required narcotic pain medication, appear to significantly limit plaintiff's daily activities, and have prompted treating physicians to opine that she is disabled (Tr. 253, 388).

The ALJ is required to address these factors as provided in the regulations. See Salazar v. Barnhart, 2004 WL 2966919 (N.D. Ill. Nov. 24, 2004)(reversing decision based on finding of no severe physical impairment, and remanding pursuant to, e.g., § 404.1529, for evaluation of objective medical evidence of a mild cervical condition which "may be related to" the alleged debilitating headaches and other pain); Lowe v. Apfel, 1999 WL 447597 (N.D. Cal. June 28, 1999)(finding error in ALJ's rejection of treating physician's opinion that plaintiff was disabled by her TMJ and related migraine headaches, when only reason given for rejection was that doctor had accepted all of claimant's subjective complaints and did not assess any exertional limitations). He failed to so, relying instead on his

38

credibility determination and the fact that the objective medical evidence does not fully substantiate a disabling level of pain or reduced exertional capacity. Thus, reversible error has been committed, <u>Felisky</u>, 35 F.3d at 1039-40, and the case should be remanded for further administrative consideration.

The undersigned would also recommend further administrative attention to the moderate limitation in plaintiff's ability to "maintain regular attendance, and be punctual within customary tolerances," as found by the ALJ (Tr. 26, 269). It would seem that if the ability to attend work and arrive on time "within customary tolerances" is at all compromised by plaintiff's mental impairments, then by definition she would need an uncustomarily tolerant employer to accommodate these limitations. The agency form where this limitation was assessed provides two less restrictive ratings, "No Evidence of Limitation in this Category" and "Not Significantly Limited," with only one more restricting rating, "Markedly Limited" (Tr. 269). The significance of this limitation is underscored by the VE's testimony that if plaintiff were consistently absent for just two days out of the month due to her symptoms, she would be unable to maintain employment (Tr. 506-07). Notably, the Sixth Circuit has affirmed the rejection of an assessment of moderate limitation in maintaining regular attendance, upon the "careful[] reasoning" of the ALJ that the claimant's ability to take her

daughter to school each morning and pick her up each afternoon
proved her capable of maintaining a regular schedule, as well as
the lack of objective medical evidence supporting such a
limitation, but (perhaps notably) did not regard such a moderate
limitation as consistent in any event with the sustained
performance of work.  <u>Jones</u>, 336 F.3d at 477.

Finally, the undersigned would recommend that the
Commissioner be directed to assign the case to a different ALJ on
remand, with instructions to supplement the medical record and
hold a new hearing.

### IV.  Recommendation

In light of the foregoing, the Magistrate Judge
recommends that plaintiff's motion for judgment on the
administrative record be GRANTED, and that the decision of the
Commissioner be REVERSED and the cause REMANDED for further
administrative proceedings consistent with this report.

Any party has ten (10) days from receipt of this Report
and Recommendation in which to file any written objections to it
with the District Court.  Any party opposing said objections
shall have ten (10) days from receipt of any objections filed in
which to file any responses to said objections.  Failure to file
specific objections within ten (10) days of receipt of this
Report and Recommendation can constitute a waiver of further

appeal of this Recommendation.  Thomas v. Arn, 474 U.S. 140

(1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en

banc).


　　　　　**ENTERED** this 22nd day of March, 2007.


　　　　　　　　　　　　　　 s/ John S. Bryant
　　　　　　　　　　　　　　JOHN S. BRYANT
　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE